UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHANNA DWYER, Derivatively on Behalf of FMC CORPORATION, | ) ) ) | Case No. |
| Plaintiff, | ) ) | VERIFIED SHAREHOLDER |
| v. | ) ) | DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| MARK A. DOUGLAS, ANDREW D. SANDIFER, PIERRE R. BRONDEAU, EDUARDO E. CORDEIRO, CAROL ANTHONY DAVIDSON, KATHY L. FORTMANN, C. SCOTT GREER, K'LYNNE JOHNSON, DIRK A. KEMPTHORNE, MARGARETH ØVRUM, ROBERT C. PALLASH, PATRICIA VERDUIN, and VINCENT R. VOLPE, JR., | ) ) ) ) ) ) ) ) ) ) ) ) ) | SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| -and- | ) ) | |
| FMC CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) ) ) ) ) ) | |
| _____ | ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Johanna Dwyer ("Plaintiff"), by her undersigned attorneys, submits this Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review and analysis of: (a) public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by Defendants; (c) a review of news reports, shareholder communications and postings on FMC's website; (d) publicly available filings in a related consolidated securities fraud class action lawsuit captioned *In re FMC Corporation Securities Litigation*, No. 2:25-cv-00771-GAW (E.D. Pa.) (the "Related Securities Action"); and (e) other publicly available information concerning FMC and the Individual Defendants (defined below under "Parties."). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendant FMC Corporation ("FMC" or the "Company") against certain current and former officers and/or directors for breaches of fiduciary duties and

violations of law, from November 16, 2023 through present (the "Relevant Period"). The wrongdoing committed resulted in damages to FMC's goodwill and business reputation. Moreover, the misconduct has exposed the Company to substantial potential liability for violations of state and federal law.

2.     FMC is a global agricultural sciences company based in Philadelphia, Pennsylvania that manufactures and sells insecticides and develops industry leading and sustainable crop protection products. The Company touts itself as having one of the most productive and diversified pipelines in the industry, bringing innovative solutions in plant health, herbicides, fungicides, and insecticides. FMC sells these products to wholesale distributors located in North America, Latin America ("LATAM"), Europe, the Middle East, Africa, and Asia. These distributors then sell FMC products out of their inventories to retailers who ultimately sell the products to farmers.

3.     At the height of the COVID-19 pandemic, supply chain disruptions and the fear of product shortages led distributors to stockpile crop protection products in their inventories. This caused FMC and other agricultural chemical manufacturers to reach record revenues that peaked in 2022. However, as pandemic restrictions were lifted and supply chain disruptions eased, FMC's channel distributors were left holding inventories that exceeded then-current demand. This excess channel inventory resulted in a revenue slowdown for FMC and similar manufacturers as

distributors and retailers began to destock their inventories by significantly reducing their orders for crop protection products. At the same time, FMC's revenues were also impacted by the growing number of generic competition for its top-selling protection products.

4.     FMC's stock took a hit in the third quarter of 2023 when an investment firm reported that FMC had previously "concealed from investors the deterioration of [its] core business[,] resulting in an inescapable cycle of falling revenues, plummeting cash flows, [and] declining profits." The report detailed how FMC had been employing steep discounts and rebates to offload product and "shore up Company cash," including to customers with "deteriorating creditworthiness." Further, the report noted that FMC had misrepresented the threat of generic market competitors to FMC's products. Then, on October 30, 2023, the Company reported a staggering 29% year-over-year decrease in third quarter 2023 revenues due to "channel destocking in all regions."

5.     In an attempt to reduce these disastrous results and improve financial performance, FMC introduced a "strategic restructuring plan" called "Project Focus" to maximize operational efficiencies, right-size the Company's cost base, and "normalize" distribution channel inventory levels. The Relevant Period starts on November 16, 2023, the day that the Company introduced Project Focus during the "FMC Investor Day 2023."

6.    Throughout the Relevant Period, FMC and certain executives and directors emphasized the "excellent progress" of Project Focus and represented to investors that FMC was "reducing channel inventory every quarter" and that its channel inventories were "rebalancing" and "normalizing" at a faster pace than expected. The Company also told investors that Project Focus would result in massive cost savings that would contribute to the Company's future profits. These assurances were repeated by the Individual Defendants to investors through FMC's SEC filings, press releases, and analyst calls, leading the market to believe that its distribution channel was successfully normalizing and that FMC was therefore able to create organic sales figures that were on track with its sales forecasts and revenue projections.

7.    Unbeknownst to investors, however, FMC's Project Focus failed to improve distributors' excess inventory levels or create organic demand for its products. Instead, however, FMC went against its own performance goals by setting unrealistic and unattainable sales targets and revenue projections, using high-risk and high-pressure sales tactics that undercut revenues, and flooding unwanted product into its distribution channel, which kept inventory levels in excess. FMC had begun implementing "cost-plus" pricing arrangements with key distributors in the form of "rebates over rebates," steep discounts, granting extremely long payment terms for products, lower prices, and more sales practices. Through these

undisclosed pricing arrangements, FMC increased its short-term revenue and sales numbers but at the expense and to the detriment of its long-term growth and expected profits from Project Focus cost savings.

8.     Throughout the Relevant Period, the Individual Defendants misled FMC investors by making false and misleading statements and/or failing to disclose and actively concealing material adverse facts that: (i) FMC's Project Focus was not succeeding in its goal of meaningfully lowering FMC inventory in the distribution channel; (ii) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse as a result of Defendants' own undisclosed sales practices; (iii) FMC had inflated short-term revenues by engaging in manipulative sales practices; (iv) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (v) FMC's pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (vi) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (vii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

9.     The truth about this fraudulent scheme was revealed to the market on February 4, 2025, when FMC reported that its fourth quarter 2024 revenue missed

consensus revenue estimates by ***$90 million*** while disclosing that "***growth was below [the Company's] expectations as [it] learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically***." The Company also revealed a disappointing 2025 financial outlook due to "***weaker demand in the channel*** as customers in many countries prioritize holding lower-than-historical levels of inventory."

10.     Later that same day the Company hosted an earnings call in which FMC's Chief Executive Officer ("CEO") Pierre R. Brondeau ("Brondeau") stated that "[t]he company needs a stronger reset than what I thought initially. We learned a lot in the fourth quarter, and it has become clear that we need to take more aggressive actions to reposition FMC. Above all we need to significantly lower FMC inventory in the channel, much beyond what we were expecting." Brondeau revealed that the Company had faced high pricing competition that it was "unwilling to meet, which . . . led us to . . . to walk away from unattractive sales opportunities." Brondeau stated that this strategy caused "lower-than-expected demand across most regions as customers lowered the amount of inventory they were willing to hold versus historical level[s]." He added that the Company was "not expecting behavior to change to such a degree," and that as a result of "the current high levels of FMC product in the channel, we now believe we have elevated channel inventories in

some countries in LATAM, including Brazil; Asia, including India; as well as Canada and Eastern Europe."

11.     Analysts were shocked by this news. For example, Wells Fargo analysts described FMC's 2025 outlook as a "shock to the system" caused by "company-specific inventory and cost actions impacting its price." Morgan Stanley analysts reacted with surprise that "there is still FMC-specific elevated levels of inventory in some countries." Bank of America analysts stated that "the discussion of 'cost-plus' pricing is new, and in our view may be a newer pricing approach that passes some of the already-expected 2025 [cost of goods sold] tailwinds to FMC's diamide partners thus hitting margins."

12.     The market reacted immediately and negatively to this news, with FMC's stock price dropping $18.12 per share, or 33.5%, to close at $35.92 per share on February 5, 2025, and FMC losing over $2 billion in market capitalization in a single day.

13.     As a result of the foregoing, FMC, as well as FMC's former CEO Mark A. Douglas ("Douglas"), current Chief Financial Officer ("CFO") Andrew D. Sandifer ("Sandifer"), and Brondeau, were named as defendants in the Related Securities Action. On July 28, 2025, Plaintiffs in the Related Securities Action filed an amended complaint (the "Amended Complaint") reiterating certain allegations made in the initial complaint and including statements from former FMC employees

in support of those allegations. The Related Securities Action has further caused FMC to undertake internal investigations and to implement adequate controls, as well as exposed the Company to massive class-wide liability.

14.    As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's common stock pursuant to the revelation of the fraud, the Company and its shareholders have suffered significant losses and damages.

15.    For these reasons and as set forth in greater detail herein, including the Board of Directors' (the "Board") unreasonable delay in investigating these matters, Plaintiff now files this action against the Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by FMC and its shareholders.

## II.    JURISDICTION AND VENUE

16.    Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Sections 10(b), 14(a), and 21D of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a)(1) and 78u-4(f)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    This Court has jurisdiction over each Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the nominal defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this District.

18.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b) because: (i) FMC maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to FMC, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

III.   **THE PARTIES**

A.   **Plaintiff**

19.     Plaintiff Johanna Dwyer has been a shareholder of FMC since at least 2020, has continuously been a shareholder since that time, and is a current FMC shareholder.

B.   **Nominal Defendant**

20.     Nominal Defendant FMC is a Delaware corporation with its principal executive offices located at 2929 Walnut Street, Philadelphia, Pennsylvania 19104. FMC's common stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "FMC."

C.   **Individual Defendants**

21.     Defendant Douglas served as FMC's President, CEO, and as a Company director from 2020 until 2024. Defendant Douglas is named as a defendant in the Related Securities Action Amended Complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. FMC paid defendant Douglas $14,968,954 in total compensation as an executive in 2024.

22.     Defendant Sandifer has served as FMC's CFO since 2018. Defendant Sandifer is named as a defendant in the Related Securities Action Amended Complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. FMC paid defendant Sandifer $3,485,618 in total compensation as an executive in 2024.

23.     Defendant Brondeau has served as FMC's CEO since June 2024 and as Chairman of the Board since October 2010. He previously served as CEO from January 2010 until May 2020, President from January 2010 until May 2018, and Executive Chairman from June 2020 to April 2021. Defendant Brondeau is named as a defendant in the Related Securities Action Amended Complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Brondeau is Chair of the Board's Executive Committee. FMC paid defendant Brondeau $10,783,649 in total compensation as an executive and director in 2024.

24.     Defendant Eduardo E. Cordeiro ("Cordeiro") has been on the Board of FMC since 2011. Cordeiro is the Chair of the Board's Audit Committee, a member of the Nominating and Corporate Governance Committee, and a member of the Board's Executive Committee. FMC paid defendant Cordeiro $280,031 in total compensation as a director in 2024.

25.     Defendant Carol Anthony "John" Davidson ("Davidson") has been on the Board of FMC since 2020. Davidson is a member of the Board's Audit Committee and Chair of the Nominating and Corporate Governance Committee. FMC paid defendant Davidson $260,031 in total compensation as a director in 2024.

26.     Defendant Kathy L. Fortmann ("Fortmann") has been on the Board of FMC since 2022. Fortmann is a member of the Board's Compensation and Human

Capital Committee and Nominating and Corporate Governance Committee. FMC paid defendant Fortmann $255,031 in total compensation as a director in 2024.

27.    Defendant C. Scott Greer ("Greer") has been on the Board of FMC since 2002. Greer is Lead Director, a member of the Board's Executive Committee, and a member of the Board's Nominating and Corporate Governance Committee. FMC paid defendant Greer $270,031 in total compensation as a director in 2024.

28.    Defendant K'Lynne Johnson ("Johnson") has been on the Board of FMC since 2013. Johnson is Chair of the Board's Compensation and Human Capital Committee, a member of the Board's Executive Committee, and a member of the Board's Sustainability Committee. FMC paid defendant Johnson $275,031 in total compensation as a director in 2024.

29.    Defendant Dirk A. Kempthorne ("Kempthorne") has been on the Board of FMC since 2009. Kempthorne is Chair of the Board's Sustainability Committee and is a member of the Compensation and Human Capital Committee. FMC paid defendant Kempthorne $257,544 in total compensation as a director in 2024.

30.    Defendant Margareth Øvrum ("Øvrum") has been on the Board of FMC since 2016. Øvrum is a member of the Board's Sustainability Committee and Nominating and Corporate Governance Committee. FMC paid defendant Øvrum $240,031 in total compensation as a director in 2024.

31.     <u>Defendant Robert C. Pallash ("Pallash")</u> has been on the Board of FMC since 2008. Pallash is a member of the Board's Audit Committee and Sustainability Committee. FMC paid defendant Pallash $245,031 in total compensation as a director in 2024.

32.     <u>Defendant Patricia Verduin ("Verduin")</u> has been on the Board of FMC since 2023. Verduin is a member of the Board's Compensation and Human Capital Committee and Sustainability Committee. FMC paid defendant Verduin $247,999 in total compensation as a director in 2024.

33.     <u>Defendant Vincent R. Volpe, Jr. ("Volpe")</u> served on the Board of FMC from 2007 until April 2023. In 2023, Volpe was a member of the Board's Audit Committee and Executive Committee. FMC paid defendant Volpe $50,000 in total compensation as a director in 2023.

34.     <u>Non-Party Director Anthony DiSilvestro ("DiSilvestro")</u> has been on the Board of FMC since December 2024. DiSilvestro is a member of the Board's Audit Committee and Compensation and Human Capital Committee. FMC paid DiSilvestro $80,031 in total compensation as a director in 2024. DiSilvestro is named herein solely for the purposes of demand futility.

35.     <u>Non-Party Director Steven T. Merkt ("Merkt")</u> has been on the Board of FMC since April 2025. Merkt is a member of the Board's Audit Committee and

Nominating and Corporate Governance Committee. Merkt is named herein solely for the purposes of demand futility.

36.     Non-Party Director John M. Raines ("Raines") has been on the Board of FMC since 2024. Raines is a member of the Board's Audit Committee and Sustainability Committee. FMC paid Raines $168,902 in total compensation as a director in 2024. Raines is named herein solely for the purposes of demand futility.

37.     Defendants Douglas, Sandifer, Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and Volpe are referred to herein as the "Individual Defendants."

38.     Defendants Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, Verduin, and Volpe are referred to herein as the "Director Defendants."

39.     Defendants Douglas, Sandifer, and Brondeau are referred to herein as the "Officer Defendants."

40.     Defendants Cordeiro, Davidson, and Pallash are referred to herein as the "Audit Committee Defendants."

41.     As further described herein, the Individual Defendants made improper material statements and omissions in the Company's press releases and public filings by failing to disclose that: (i) FMC's Project Focus was not succeeding in its goal of meaningfully lowering FMC inventory in the distribution channel; (ii) FMC's

channel inventories were not rebalancing or normalizing, and in fact, were getting worse as a result of Defendants' own undisclosed sales practices; (iii) FMC had inflated short-term revenues by engaging in manipulative sales practices; (iv) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (v) FMC's pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (vi) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (vii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

## IV.    **INDIVIDUAL DEFENDANTS' DUTIES**

42.    By reason of their positions as directors and officers of FMC and because of their ability to control the business and corporate affairs of FMC, the Individual Defendants owed, and continue to owe, FMC and its stockholders the fiduciary obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

43.    The Individual Defendants were, and are, required to use their utmost ability to control and manage FMC in a fair, just, and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

44.     The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, had a duty to promptly disseminate accurate and truthful information with regard to FMC's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of FMC's stock would be based on truthful, accurate, and fairly presented information.

45.     Further, the Individual Defendants were, and are, required to act in the best interests of FMC and its shareholders so as to benefit all shareholders equally, and not for their personal interest and benefit.

46.     Similarly, the Individual Defendants were, and are, required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions, policies, or practices, and, if necessary, to make all disclosures necessary to comply with applicable laws.

47.     FMC's Audit Committee Charter (amended as of December 11, 2024) states, in relevant part:

**I. Purpose**

The Audit Committee (the "Committee") of the [Board] of [FMC] shall assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor and (4) the compliance by the Company with legal and regulatory requirements.

The Committee shall prepare the report required by the rules of the [SEC] to be included in the Company's annual proxy report.

*    *    *

## IV. Authority, Duties, and Responsibilities

*    *    *

A. <u>Review Procedures</u>

1. Meet to review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in Management's Discussion and Analysis and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2. Meet to review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including disclosures made in Management's Discussion Analysis, and the results of the independent auditor's review of the quarterly financial statements.

3. In connection with the reviews of the Form 10-K's and Form 10-Q's above, review and discuss with management and the independent auditor the following matters, as applicable:

   a. Significant issues regarding accounting principles, financial reporting, financial statement presentation, and judgments made in the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles;

b. Significant issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies;

c. The independent auditor's report on:

   i. All critical accounting policies and practices to be used;

   ii. Alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor;

   iii. Other material written communication between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

d. Matters required to be discussed by PCAOB Standard No. 1301 "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, and any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e. Disclosures made to the Committee by the Company's CEO and CFO regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls over financial reporting and evaluations thereof.

f. The effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the Company's financial statements.

*      *      *

C. <u>Internal Audit Department</u>

1. Discuss the internal audit plan with the chief audit executive, including the scope, budget and qualifications of the internal audit staff, as deemed necessary.

2. Approve the appointment, performance and replacement of the chief audit executive.

3. Review significant internal audit findings with the chief audit executive, along with management's responses and follow-up to the findings, together with explanations for any significant deviations from the original plan.

D. Compliance and Other Matters

1. Review annually the travel and entertainment expenses of the Chairperson and President, and a summary of all other corporate officers' travel and entertainment expenses.

2. Review and discuss any reports from the Corporate Responsibility Committee, management, internal auditors, and independent auditor regarding the Company's (including its subsidiary/foreign affiliated entities) conformity with applicable legal requirements and the Company's Code of Ethics and Business Conduct Guidelines.

3. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

4. Establish and review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

5. Conduct or authorize investigations into any matters within the Committee's scope of responsibilities. For that purpose, the Committee shall be empowered to retain independent counsel, accountants, or other advisors to assist in the conduct of such investigations and shall advise the Board as to the nature and extent of such investigations. The Company shall provide for appropriate funding, as determined by the Committee, for payment of

compensation to the independent auditor for the purpose of rendering or issuing an audit report and to any advisors employed by the Committee.

48.    FMC's Code of Ethics and Business Conduct (the "Code of Conduct") opens with remarks from defendant Brondeau, stating that "[a]t FMC, we are committed to conducting our business with honesty and integrity and complying with all applicable laws. FMC's [Code of Conduct] exemplifies our dedication to these high business standards. The [Code of Conduct] summarizes the legal and ethical principles that we follow in our daily work and applies these principles to our policies and practices." The Code of Conduct further states, in relevant part:

**Commitment to Ethics**

Ethical behavior is an individual responsibility. Behavior reflecting high ethical standards is expected of all directors, employees and others who are bound by the [Code of Conduct], regardless of position or location. No director, officer, manager or supervisor has the authority to violate or require conduct by another employee or any other person that violates the [Code of Conduct], other FMC policies or applicable law.

The obligations in the [Code of Conduct] apply to FMC Corporation, its subsidiaries, affiliates, joint ventures and all other entities, that, in each case, are directly or indirectly controlled or managed by FMC, the employees and directors of these entities (to the extent applicable to their work for FMC) and suppliers and contractors in their work on behalf of FMC.

\*      \*      \*

2. We Comply with the Code, Other FMC Policies, and All Applicable Laws.

We comply with the [Code of Conduct], other FMC policies and all applicable laws in conducting our business. There are countries where common trading or negotiating practices are based on codes of conduct that are less stringent or different than the [Code of Conduct]. In such countries, employees should follow the [Code of Conduct], except for variances that are permitted by applicable law and are based on good ethical and business judgment. The relevant regional president or department head, or a president or vice president of FMC Corporation if no division manager is available, must approve any such variance in writing. Contact an FMC lawyer if you have any questions about the application of the law of any country, about the [Code of Conduct], or about the relation or any apparent conflict between them.

In the unusual circumstances where a waiver of the [Code of Conduct] would be appropriate for an executive officer or director, such waiver must be approved by the [Board] or a committee of the Board and promptly disclosed as required by applicable laws and regulations. In the case of all other employees, only a corporate officer, in conjunction with the General Counsel, may grant such a waiver.

*    *    *

4. We Report Suspected Non-Compliance.

Any employee who learns of a suspected violation of the [Code of Conduct] must immediately report it by following the procedure below. Employees are required to come forward with any such information without regard to the identity or position of the suspected offender.

**FMC will treat the information in a confidential manner and will ensure that no acts of retribution or retaliation will be taken against anyone for making a report in good faith.**

**Non-Compliance Reporting Procedure**

- Employee Report: Any employee who learns of a violation of the [Code of Conduct] must immediately report it.

- Investigation: It is FMC's policy and intent to investigate any reported violation of the [Code of Conduct], other FMC policy, or applicable law, and to take appropriate action, as determined by FMC, based on the results of the investigation.

- 21 -

Reports of violations of accounting, accounting controls and audit matters will be investigated under the supervision of the Director of Internal Audit and the Audit Committee of the [Board]. All other violations will be investigated under the supervision of the Ethics Office. Employees are expected to cooperate in the investigation of reported violations.

- <u>Confidentiality</u>: Each investigation, all associated documents, and the identities of those involved (reporters, accused parties, investigators, participants, etc.) will be managed confidentially, securely, and on a need-to-know basis. Employees should be aware that the Ethics Office, Corporate Responsibility Committee and Audit Committee are obligated to act in the best interests of FMC and do not act as personal representatives or lawyers for the employees.

- <u>Protection Against Retaliation</u>: Retaliation in any form against an individual, who in good faith reports a violation of the [Code of Conduct], even if the report is mistaken, or who assists in the investigation of a reported violation, is prohibited. **Every employee may report such violations without fear of retaliation by coworkers, supervisors or others that are the subject of the report.**

- Employees should refer to FMC's Ethics Response Line and Investigation Policy for further detail.

*    *    *

**Discipline for Non-compliance**

Failure to comply with the [Code of Conduct] will result in disciplinary action ranging from a reprimand to dismissal. Civil or criminal violations may be prosecuted.

*    *    *

18. We Do Not Engage in Insider Trading or Related Unlawful Conduct.

Employees and directors usually may buy or sell the publicly traded securities of FMC and other companies. However, U.S. law prohibits

the buying and selling of publicly traded securities by a person with insider information. Even minor violations of the securities laws can have severe consequences. Penalties include forfeiture of gains, civil penalties of up to three times the profit gained or loss avoided, prison terms, and large fines.

Insider trading rules apply to all kinds of securities, including common and preferred stock, bonds, commercial paper, options, and warrants. They apply to direct buying and selling by the individual with knowledge and to tipping off a friend or family member who buys or sells.

People with inside information include:

- Officers, directors and employees of FMC who learn material, non-public information in the course of their job;

- People in a confidential relationship with FMC such as bankers, consultants and lawyers; and

- People who learn material information from a friend or acquaintance about a company with which the friend or acquaintance has a relationship. Although people may be aware of inside information about a company, the insider trading rules apply only to information that is "material." There is no definition of materiality that will apply in every case, but generally information is considered material if it can reasonably be expected to affect the market price of a company's stock. Some examples of material information are:

- Earnings information about a company;

- Plans for expansion or shut-down of facilities or significant write-offs or write-downs in the value of a company's assets;

- Certain transactions, such as mergers with other companies, acquisitions of other companies or parts of other companies, sales of all or part of a company, tender offers for or by another company; and

- Major changes in management.

Because of the severity of fines and the complexity of the applicable rules, you should contact an FMC lawyer if you have any question whether the insider trading rules apply to the purchase or sale of FMC's or any other company's securities.

FMC executive officers and directors are also prohibited from trading in FMC's publicly traded securities during any period in which participants in FMC's retirement plans could not engage in a similar type of transaction. Additional details on these restrictions are available through the General Counsel's office.

\* \* \*

20. We Keep Accurate Company Records and Make Full, Fair, Accurate, Timely and Understandable Disclosures.

We make full, fair, accurate, timely and understandable disclosures in reports that FMC files under applicable laws, rules and regulations and in other public communications. Dishonest reporting, both inside and outside the company will not be tolerated. This includes reporting or organizing information in an attempt to mislead or misinform. No entry will be made on the company's books and records that intentionally hides or disguises the true nature of any transaction.

FMC has adopted controls to ensure the safeguarding of FMC assets and the accuracy of its financial records and reports in accordance with internal needs and requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All employees, within their area of responsibility, are expected to adhere to these procedures, as directed by the appropriate FMC manager.

No employee or director may interfere with or seek to improperly influence, directly or indirectly, the auditing of FMC's financial records. Violation of these provisions shall result in disciplinary action up to and including termination, and may also subject the violator to substantial civil and criminal liability. If an employee becomes aware of any improper transaction or accounting practice, he or she must immediately report the matter as described in Section 4 of this [Code of Conduct].

Our obligation to record and report information accurately and honestly also applies to the accurate reporting of time worked, business expenses incurred, research test results and other business-related activities.

21. We Manage Our Records Properly.

To operate effectively and efficiently, records must be managed properly. Documents needed for ongoing business or required by law must be retained, while all other documents should be discarded. If excess records are not discarded, the costs and distraction of records maintenance escalates continually.

Documents should be discarded on an ongoing basis as they are no longer needed, and a general review of documents as to whether they are still needed is to be conducted at least once per year. In general, no document should be retained for more than two years unless it is needed for ongoing business or a law requires its retention. Before disposing of documents, employees and directors should consult FMC's Record Retention Policy on FMC's Intranet. Those who are unsure about the need to keep particular documents should consult with their records administrator or supervisor, so that a judgment can be made as to the likelihood that the documents will be needed. Whenever it becomes apparent that documents will be required in connection with a lawsuit or government investigation, we will preserve all possibly relevant documents and immediately suspend ordinary disposal or modification of documents pertaining to the subjects of the litigation or investigation. Under no circumstances will we alter any of these documents. If we are uncertain whether documents under our control should be preserved because they might relate to a lawsuit or investigation, we will contact the Law Department for guidance.

V.  **SUBSTANTIVE ALLEGATIONS**

49.    FMC, a Delaware corporation based in Philadelphia, Pennsylvania, is a global agricultural sciences company that that describes itself as "the fifth largest global innovator in the agrochemicals/crop protection market." The Company manufactures, markets, and sells crop protection chemicals such as insecticides,

herbicides, fungicides, and plant health products. FMC invests in discovering new active ingredients, developing innovative formulations and biologicals in addition to advancing precision agriculture technologies that support sustainable agriculture around the world.

50.     FMC markets its products through its own sales organization and through alliance partners, wholesale distributors, and sales representatives. FMC's operations are divided into four major regions: North America; Latin America ("LATAM"); Asia-Pacific ("APAC"); and Europe, the Middle East, and Africa ("EMEA").

51.     Among FMC's largest revenue generators are its two diamide insecticides, Rynaxypyr and Cyazypyr, which it acquired from DuPont for $1.2 billion in 2017. The acquisition of Rynaxypyr and Cyazypyr included several related patents, including: (i) Composition of Matter Patents, which "[p]rotect[ed] [the] proprietary molecular structure of the active ingredient and the molecular structure of certain intermediates"; (ii) Process Patents, which "[p]rotect[ed] the manufacturing processes for the active ingredient and the key intermediates used to make the active ingredient"; (iii) Formulation patents, which "[p]rotect[ed] product formulations that use[d] the active ingredient"; (iv) Use Patents, which "[p]rotect[ed] how a product containing the active ingredient [was] used"; and (v)

Application Patents, which "[p]rotect[ed] the methods or approaches to apply products containing the active ingredient."

52.    As previously stated, the Company primarily sells Rynaxypyr and Cyazypyr directly to wholesale distributors. The authorized distributors then sell FMC products out of their inventories to retailers who ultimately sell the products to farmers and other end-users. While manufacturers deal with researching, marketing, and producing crop protection products, they lack the storage and logistics networks necessary to distribute products at scale, making distributors a vital component of the industry. Moreover, distributors have extensive knowledge of regional markets as well as connections with local retailers, growers, and farmers. Accordingly, the Company maintains close, long-standing relationships with its distributors, some of whom the Company has worked with for over twenty-five years. FMC has long-term pre-payment agreements to guarantee continuous supplies of inventory. This arrangement provides the Company with extensive visibility into the inventory levels maintained by its distributors.

53.    The COVID-19 pandemic brought supply chain disruptions and a fear of product shortages which caused an increase in demand for the Company's products as distributors, retailers, and consumers stockpiled on crop production products in their inventories. By 2022, FMC and competitors saw revenues peak to record highs from this heavy increase in buying stock supplies. However, this

increase in purchasing activity left distributors with excess products. In an attempt to destock their own inventories, these distributors were forced to significantly reduce their need for new orders for crop protection products, resulting in a revenue slowdown for FMC.

54.    Excess inventory accumulation was not the only market factor causing a downward pressure on demand for FMC's crop protection products during this time period. An increase in generic competition, specifically for Rynaxypyr and Cyazypyr, caused substantial decrease in demand which negatively impacted FMC's sales. The extent of these challenges were made apparent on October 23, 2023, when the Company reported a 29 percent year-over-year decline in revenue for its third quarter of 2023 because of "channel destocking in all regions."

55.    Shortly thereafter, the Company implemented a strategic restructuring plan called "Project Focus." The goal of Project Focus was to maximize operational efficiencies, "right- size [FMC's] cost base and optimize [FMC's] footprint and organizational structure with a focus on driving significant cost improvement and productivity." Among other things, FMC represented to investors that Project Focus would result in massive cost savings that would contribute to increased future profits for the Company.

## VI.  **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

56.     During the Relevant Period, the Individual Defendants made materially false and misleading statements and omissions about the success of Project Focus, specifically as it related to the Company's efforts to stabilize its channel inventory, achieve massive cost savings, and increase productivity to foster sustainable growth. In reality, FMC's actions actively undercut these stated goals through: (1) short-sighted, manipulative sales tactics that pushed excess product into the market, inflating inventory levels the Company had publicly pledged to reduce; (2) reconfiguring and delaying returns of unused product to avoid reporting returns; (3) recording substantial sales to high-risk, financially distressed customers; and (4) pulling sales forward to meet quarterly sales targets at the expense of later quarters.

57.     On November 16, 2023, the Company held its FMC Investor Day 2023 during which it unveiled strategic new initiatives, which would later be implemented in Project Focus. During its presentation, defendant Douglas outlined FMC's path forward, stating that "***[w]e are maintaining or gaining market share at the grower level in all regions, while continuing to see good traction for our new products***." Defendant Douglas added that "***[w]e fully expect the destocking reset is transitory, and that the channel will begin to rebalance and ease back into somewhat more normal patterns as we enter mid-2024***." The Company told investors that it

expected "***$50 to $75 million in savings delivered in 2024***," and "***more than $150 million in run-rate savings by the end of 2025***."

58.    Also during the conference defendant Sandifer provided additional details on FMC's Strategic Plan, stating that:

> While [defendant Douglas] gave an overview of our restructuring program in his opening remarks, let me share some additional details given the importance of this program to our 2024 outlook.
>
> ***The restructuring program builds on a number of initiatives identified within our strategic plan, particularly with respect to two of our strategic imperatives: one, driving a competitive and resilient supply network; and two, increasing operating leverage and optimizing functional costs***. We have chosen to accelerate these actions as part of the restructuring program in order to more quickly ***align FMC's cost structure to the current market realities while ensuring we remain positioned for long-term success***.
>
> Through this program, we will reduce cost and complexity as well as improve speed and efficiency. Simplification is a key theme, particularly for our back-office operations.

59.    Defendant Sandifer discussed returning to normal levels, stating that:

> ***Our focus this coming year will be on returning working capital to more normal levels. This means converting inventory to receivables by selling product on hand, and then collecting those receivables. This further means cautiously ramping up production to keep inventory at lower targeted levels, rebuilding payables in the process.***

60.    During the question-and-answer portion of the presentation, defendant Douglas was asked about the confidence that channel inventories would normalize in the following pertinent exchange:

> Michael J. Harrison, Seaport Research Partners: [defendant Douglas], you talked a little bit earlier about your view that channel inventory

levels might be below normal now at least in some regions. What gives you that visibility? Are you doing anything differently now than you have earlier in the year? And if so, what gives you that confidence?

Defendant Douglas: Yeah. Certainly when you think about where the industry is today, we're spending a lot more time talking to distribution, retail and where we have access to growers, talking to growers. That's happening in Asia, it's happening in Europe, certainly happening in the US and Brazil. . . . I do think there are certain places and Brazil will get to that point where we see pockets of people drawing their inventories down below normal. That's going to happen.

There are some places where it won't be below normal. But I do think in the US, we certainly know that at the grower level and at retail, the inventory levels are way below normal. But at the distribution level, as we enter the season, they're high. ***So that material will flow through the channel. It's already starting to flow through the channel. So we expect that to normalize pretty quickly***.

61.    On December 18, 2023, FMC filed a Form 8-K detailing the goals of its Project Focus cost restructuring and inventory balancing plan, stating, in pertinent part, that:

> In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, which has materially impacted volumes in 2023, ***the Company has initiated a global restructuring plan, which we refer to as "Project Focus." This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity. The Company's objective for Project Focus is to deliver $50 to $75 million in contributions to adjusted EBITDA in 2024. The Company is further targeting annual run-rate savings of $150 million or more by the end of 2025 from the program once fully implemented***.

62.    On February 5, 2024, FMC issued a press release titled "FMC Corporation announces fourth quarter and full-year 2023 results within guidance

ranges, provides 2024 outlook," announcing its financial results for the fourth quarter and full year ended December 31, 2023 (the "Q4 2023 Press Release"). In the Q4 2023 Press Release, FMC touted its "***strong results despite continued destocking***." Defendant Douglas was quoted, stating that "***[d]uring the fourth quarter we observed continued channel destocking in all regions***." The press release further stated that "[f]irst quarter revenue is expected to be in the range of $925 million to $1.075 billion, a 26 percent decrease at the midpoint compared to first quarter 2023 ***due to lower volume from destocking activity in all regions***."

63.    The next day, on February 6, 2024, the Company hosted an earnings call for the fourth quarter of 2023 (the "Q4 2023 Earnings Call") with investors and analysts. During the question-and-answer portion of the Q4 2023 Earnings Call, Sandifer was asked about FMC's working capital, particularly inventory, in the following pertinent exchange:

> Kevin William McCarthy: Okay. And then secondly, perhaps for [Sandifer], can you talk about the amount of working capital that you think you can extract in 2024, including inventory. And as you draw down inventory, what impact do you think or do you expect that will have on your earnings, if any, I imagine it creates fixed cost absorption challenge. Is that true? And how would your guide be different if you weren't drawing down inventory, if that makes sense?

> Defendant Sandifer: Yes. Thanks, Kevin. Sure. I think certainly, as we're looking to free cash flow for 2024, working capital, particularly accounts payable and to a lesser degree, inventory are really the big drivers of cash release in 2024. ***And that's in part because of an expectation as we go through the year, then we start rebalancing and production and inventory***. We have been intentionally throttling back

pretty severely manufacturing over the past two quarters and well into Q1. We would expect to see some ramping back up in manufacturing activity as we go through Q2 through Q4. That will help with bringing up accounts payable.

64.    On February 27, 2024, FMC filed with the SEC a Form 10-K reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by defendants Sandifer, Brondeau, Douglas, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin. Attached to the 2023 10-K were certifications pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), signed by Douglas and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the 2023 10-K "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934." The 2023 10-K described "Channel inventory behavior" as a "General Risk Factor":

> Channel inventory behavior – The Company relies in many countries and in varying degrees on distribution channels to access the market and reach farmers or other end use customers. ***An abrupt and widespread shift in purchasing behaviors (e.g., the current inventory destocking phenomenon) by channel partners and end use customers has and may continue to negatively and materially impact the Company's volumes across important markets, which has adversely affected and may continue to adversely affect our results of operations***. Such adverse effects could include but not be limited to materially reduced volumes purchased by customers, resulting in not only reduced sales, but also the Company bearing higher volumes of unsold product inventory, excess raw materials, and correspondingly increased carrying costs.

65.    On March 15, 2024, FMC filed with the SEC a proxy statement on Schedule 14A (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin, soliciting shareholders to vote to approve: (i) the election of eleven directors, each for a term of one year; (ii) the ratification of the appointment of KPMG LLP as the Company's independent registered public accounting firm for 2024; (iii) an advisory (non-binding) vote on executive compensation; and (iv) votes on a stockholder proposal requesting simple majority vote.

66.    Regarding FMC's Code of Conduct, the 2024 Proxy Statement states:

The Company has a [Code of Conduct] that applies to all directors, officers (including its [CEO], [CFO] and Controller) and employees. It is posted on the Investor Relations page of the Company's website under "Governance — Corporate Policies" at investors.fmc.com/governance/corporate-policies/.

The Company intends to post any amendments to, or waivers from, the [Code of Conduct] required to be disclosed by either SEC or NYSE regulations on the "Governance — Corporate Policies" section of the Investor Relations page of the Company's website at investors.fmc.com/governance/corporate-policies/.

67.    Regarding the Board's role in overseeing the risk management process, the 2024 Proxy Statement provided the following, in pertinent part:

As part of the Company's risk management process, the Board regularly discusses with management the Company's major risk exposures, their potential financial impact on the Company, and the steps the Company takes to manage them. The Board also reviews the

designation of the management person or entity responsible for managing such risks, and evaluates the steps being taken to mitigate the risks. The Board's monitoring role is carried out by either the full Board or a Committee that reports to the Board, depending on the risk in question. The Board has determined that a separate Risk Committee is not warranted at this time.

68.    The above statements contained in the 2024 Proxy Statement were materially false and misleading because the Individual Defendants failed to carry out their obligations overseeing the risk management process and failed to abide by the Code of Conduct.

69.    The Individual Defendants caused the 2024 Proxy Statement to be false and misleading by failing to disclose that: (1) Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (2) FMC's channel inventories were not rebalancing or normalizing, but instead were getting worse; (3) Project Focus was failing to accelerate manufacturing cost reductions; (4) the Company's cost-plus pricing arrangements with key distributors would drastically lower FMC's revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (6) as a result of the above, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

70.    On May 6, 2024, FMC issued a press release titled "FMC Corporation delivers first quarter earnings at higher end of guidance range, maintains full-year outlook," announcing its financial results for the first quarter ended March 31, 2024 (the "Q1 2024 Press Release"). In the Q1 2024 Press Release, defendant Douglas was quoted in the press release stating that "***[o]ur second quarter revenue outlook includes volume growth for the first time since global destocking began in the second quarter of 2023***." Defendant Douglas added that "[w]e expect the market to continue to improve as we progress through the year and transition to more normal conditions in 2025. ***The combination of steady on-the-ground application, demand for our innovative and differentiated portfolio and a more efficient cost structure places FMC in a strong position as the market recovers***."

71.    The next day, on May 7, 2024, FMC hosted an earnings call for the first quarter of 2024 (the "Q1 2024 Earnings Call") with investors and analysts. During the Q1 2024 Earnings Call, defendant Douglas stated that:

> ***Data from third parties as well as input from our commercial teams shows that the inventory reduction actions in the channel are making good progress***.
>
> On a regional basis, the pace of destocking is varied. We see North America furthest along, with inventories at the retail and grower level back to normal, while distributors are still working to reduce their level of inventory. EMEA is in a similar condition, except in countries hit by unfavorable weather. ***In both these geographies, our customers are now targeting to operate with inventories at lower-than-normal levels***. In Latin America, ***inventories are materially lower and are expected to trend towards more normal levels as we move through the rest of***

*the year*. We expect India destocking to persist well into 2025, but parts of Asia, such as ASEAN and Pakistan, have made strong progress in destocking in Q1.

*While these activities continue to run their course, we're encouraged by the first signs that customers are starting to return to historical order patterns*. In North America, we continue to receive orders for products that will be used early in the current season, which indicates that the inventories of such products have now been depleted. In Brazil, customers are now discussing next season's volumes, providing visibility that we did not have last year. *Our full year outlook assumes that the market improves as the year progresses, but the customers will seek to hold lower levels of inventory*.

We are forecasting our second quarter results to be similar to the prior year. Sales are expected to be between $1 billion and $1.15 billion, which represents a year-on-year growth of 6% at the midpoint, driven by higher volume. *This is the first quarter during which we expect to report an improvement in year-over-year volume since the start of global destocking*. Price is anticipated to be a headwind in the low- to mid-single digits and the FX outlook is neutral.

*    *    *

*EBITDA in the second quarter is expected to be between $170 million and $210 million, up 1% versus the prior year at the midpoint*. At the EBITDA midpoint, we expect that volume growth and restructuring benefits will be offset by lower price and COGS headwinds.

Adjusted earnings per share is expected to be between $0.43 and $0.72, an increase of 15% at the midpoint, due mainly to lower interest expense and D&A.

72.    During the question-and-answer portion of the Q1 2024 Earnings Call, defendant Douglas was asked by an analyst about FMC's "internal inventory" and "where you are now versus where you would like inventories to be." In response, defendant Douglas emphasized the success of FMC's sales and inventory reduction

efforts, stating that "we peaked inventory basically around about August last year internally. And *we've been obviously on the track since we first came into this channel destocking to really remove inventory as fast as we could. We're getting close to the point. We're not quite there yet. We're getting close to the point where at the macro level for our inventory, we're going to be pretty much where we want to be*." Defendant Douglas continued, stating, "*I would say by the time we get through Q2 and into Q3, we're going to be in pretty good shape in terms of where our revenue is reset this year versus where the inventory needs to be*."

73.    Also during the question-and-answer portion of the Q1 2024 Earnings Call, an analyst asked defendant Douglas about the normalization of FMC's channel inventory following destocking, in the following pertinent exchange:

> Edlain Rodriguez, Mizuho Securities: As inventory destocking comes to an end and as you get into 2025, like, how do you see volume grow for the portfolio in 2025 and 2026?
>
> Defendant Douglas: Yeah. Listen, as we go through 2025, I think we've said that we expect what we would consider a more normal type of growth for the marketplace. Acres continue to grow, certainly, in Latin America and Brazil, so we expect that to be a driver. And don't forget, *at that point, people will be then resetting from a lower level of inventory. So, you would expect more of a normal market growth*. Typical market like this grows at anywhere from 2% to 3% per annum, and we generally speaking with our differentiated portfolio, outgrow the market in the long haul.
>
> So, I think it's more about a normalized market. *Demand on the ground, as we said, even in these conditions, is very good, we expect that to continue. As pressure continues to change, so we see that market piece as being pretty robust*. Obviously, our NPIs are growing

rapidly, so we would expect 2025 and 2026 to be actually faster than the growth we see in 2024.

And then, the other piece of which is not really market driven, but just a view of 2025, we have a lot of cost headwinds flowing against us right now that are obviously depressing our EBITDA and our EBITDA margin. ***Those turn into tailwinds as we go into next year and I think it's an important facet as we walk through the next couple of earnings calls, as we build out the picture of what 2025 is going to look like, you certainly have got a more stable, more robust external market***. But we also have some pretty significant tailwinds in the sense of how we think about our P&L.

74.     Also during the question-and-answer portion of the Q1 2024 Earnings Call, an analyst asked defendant Sandifer if the market should expect FMC's cash flow to "be more back half weighted in 2024." In response, defendant Sandifer affirmed this expectation, stating that "essentially all of the positive free cash flow for the year is going to come in the second half." Sandifer continued, stating:

> ***What we are carefully balancing is continuing to bring down our absolute level of inventory while selling through at the higher rate we're expecting to sell in the second half new production***. So, it will be a staggered step as we go through the rest of the year to bring payables back up to a more reasonable level and to get inventory again a couple hundred million less than where we are today. So, that will be the combination of those two and it really will take through the full second half to get the cash benefit from those actions.

75.     Also on May 7, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the first quarter of 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q filing included SOX certifications, signed by defendants Douglas and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the Q1 2024 10-Q "fully complie[d] with the requirements

of Section 13(a) of the Securities Exchange Act of 1934." In the Q1 2024 10-Q, the

Company stated that:

> We expect 2024 free cash flow (Non-GAAP) to fall within a range of approximately $400 million to $600 million. At the mid-point of the range, ***there is a significant increase year over year driven largely by the rebuilding of payables and lower inventory***. . . . In response to the unprecedented downturn in the global crop protection market that resulted in severe channel destocking, we initiated the Project Focus global restructuring plan. ***This program is designed to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity***.

76.    On May 15, 2024, FMC participated in the BMO Global Farm to

Market Conference. In his opening remarks, Douglas stated the following in regard

to FMC's channel inventory levels:

> I think many of you are aware of all the issues we've had coming out of COVID with supply chains, with destocking. That's something that's on everybody's mind. Certainly is on Andrew and I's – with my mind, I think ***as we go through the rest of this year and as we certainly go into 2025, you're going to start to see a more normalization***. It's not going to be smooth. It's going to be bumpy. ***But we're getting to the end of this destocking period, and I think that's an important facet for investors to recognize that supply chains can't empty forever and they have to replenish. That's the phase we're in now. We call it a transition this year. I think that's an apt description***.

77.    Then, during the question-and-answer portion of the conference,

Douglas responded to a question asking about the Company's channel inventory

levels in various regions, as stated in the following pertinent exchange:

> Q: Joel Jackson, BMO Capital Markets: Why don't we talk about more regional, so we're talking more broad and maybe you can break down each region and talk about where the – how we're flipping from

destocking to restocking? And how you see inventories in each region right now.

A: Douglas: Yeah, I think I think there's been a lot of commentary around the different regions of the world. North America is probably the furthest along, was one of the first regions to get hit by this change. I would say, distribution still a little high, retail and grower is very low. So ***North America is in pretty good shape. Europe's the next that is going through their season now***. So they started to deplete last year. Depleting a lot more now. Asia is a mixed bag. India inventories are very high, that – we have high inventory, others in the industry have high inventory. That's mainly due to weather, though not necessarily the same dynamics as we see in the rest of the world. And then Latin America I mean, Latin America is finishing its season now. It's not bad. It's not exactly where it should be, but it's getting there. ***So as we roll into the 2024-2025 season in Q4 this year, it'll be in much better shape***.

78.    On June 11, 2024, the Company participated in the 2024 Wells Fargo Industrials Conference. In his opening remarks, Sandifer made the following statements about FMC's channel inventory levels:

> ***We're actually sitting in places where inventories are well below what has been historically held in the channel***. And we have a few places where we're a little slow to meet an order occasionally because we don't always have every single product on the shelf someone might want. There's a reason these products are carried in inventory during a growing season.
>
> The demand for them can be fickle and hard to predict. When bugs show up in your field, you need an insecticide today. Not two weeks from now, not five weeks from now, you need it today. ***So we are seeing these things rebalance***. The timing and the magnitude of that rebalancing $324 million is a bit, it is a complicated issue we're working through. ***But I think fundamentals here, the in market demand is still strong as the channel inventory corrects. And we get more in sync the flow from manufacturers through the distribution channel into the grower hands, we will see a rebalancing and a rebasing of the business***.

And that's where we see a pivot back to FMC of all in terms of our ability to drive growth with technology, with differentiation and with a closeness to customers and there's certainly places we can put down here on all those topics.

79.     Then, during the question-and-answer portion of the conference, Sandifer responded to a question asking about the Company's channel inventory levels, as stated in the following pertinent exchange:

> Q: Richard Garchitorena, Wells Fargo Capital Markets: So as we enter 2025, the expectation is that inventories at that point should be at a place where?
>
> A: Sandifer: Yeah, I think as we move into 2025, look I'm very careful about using the word normal because we've been through a period in the last five years. And I think anybody who tries to define normal at this point to fool's game. ***What we are seeing is improving conditions. We are seeing channel inventories reduce, we will see a rebalancing, a resining of pull through by growers from all the way back up channel back to manufacturers where that's been broken in the past four quarters as that channel, the inventory that built up in between needed to be drawn down***.

80.     That same day, June 11, 2024, FMC announced that Douglas had resigned from his roles of President, CEO, and Board member of FMC. FMC also announced that its Board had appointed Brondeau to succeed Douglas as CEO. In addition, the Board appointed Ronaldo Pereira to succeed Douglas as president of FMC.

81.     On July 31, 2024, FMC issued a press release titled "FMC Corporation announces second quarter earnings at higher end of guidance range; updates full-year outlook," announcing its financial results for the second quarter ended June 30,

2024 (the "Q2 2024 Press Release"). In the Q2 2024 Press Release, new CEO defendant Brondeau was quoted as stating: "*[d]emand improved during the second quarter*, resulting in a pronounced increase in [FMC's] sales volumes, most notably within the United States and Brazil, *despite customers continuing to actively manage inventory*." Defendant Brondeau also stated that "*[FMC] expect[s] demand to increase as the year progresses even as customers maintain a careful approach of managing inventory*."

82.    The next day, on August 1, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the second quarter of 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q filing included SOX certifications, signed by defendants Brondeau and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the Q2 2024 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934." In the Q2 2024 10-Q, FMC stated that it had been implementing Project Focus's restructuring plan "*to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity*" and that "*[w]e expect the plan to be fully executed by the end of 2025*."

83.     That same day, on August 1, 2024, FMC hosted an earnings call for the
second quarter of 2024 (the "Q2 2024 Earnings Call") with investors and analysts.
During the Q2 2024 Earnings Call, defendant Brondeau stated that:

> We delivered a solid Q2, helped by the successful execution of our
> restructuring program. **We expect continued growth in Q3 and Q4**
> **from demand recovery, led by the Americas, where we expect channel**
> **inventory to approach normal levels by year-end**. Q2 through Q4 all
> **show higher revenue driven by volume**, with the rate of growth
> accelerating in Q4 as we shift into the next crop season. **The markets**
> **have begun to recover as channel inventories are starting to**
> **normalize, even if not as fast as we had previously expected**. We plan
> for FMC's pace of revenue and earnings growth to accelerate through
> the rest of 2024 and throughout 2025.

84.     On October 29, 2024, FMC issued a press release titled "FMC
Corporation reports strong growth in third quarter, confirms full-year outlook
adjusted for expected sale of GSS business," announcing its financial results for the
third quarter ended September 30, 2024 (the "Q3 2024 Press Release"). Defendant
Brondeau was quoted in the Q3 2024 Press Release, stating, "*[s]trong volume*
*growth in Latin America and North America* more than offset lower pricing,
particularly in Brazil and Argentina which accounted for two-thirds of the total
company price decline. *Despite suboptimal market conditions, we saw increased*
*demand for new products*, specifically fluindapyr-based fungicide products, which
confirms the strength of FMC's innovation pipeline." Also in the Q3 2024 Press
Release, FMC stated that "*[r]evenue growth in the quarter of 9 percent was driven*

*by a 17 percent increase in volume*, with some North America second half orders occurring earlier than expected *due to improved channel inventory levels*."

85.    The next day, on October 30, 2024, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q filing included SOX certifications, signed by defendants Brondeau and Sandifer, attesting to the accuracy of the financial statements contained therein and certifying that the Q3 2024 10-Q "fully complie[d] with the requirements of Section 13(a) of the Securities Exchange Act of 1934." In the Q3 2024 10-Q, FMC stated that it had been implementing Project Focus's restructuring plan "*to right-size our cost base and optimize our footprint and organizational structure with a focus on driving significant cost improvement and productivity*" and that "*[w]e expect the plan to be fully executed by the end of 2025*."

86.    That same day, on October 30, 2024, FMC hosted an earnings call for the third quarter of 2024 (the "Q3 2024 Earnings Call") with investors and analysts. Defendant Brondeau opened the Q3 2024 Earnings Call by addressing the Company's quarterly results:

> *Overall, we reported a strong third quarter with growth at the top and bottom line*. The quarter unfolded mostly as expected in Europe and Asia. However, *we operated in a weaker-than-expected market landscape in Latin America*, which was offset by a stronger-than-anticipated performance in North America.

*Latin America faced some unanticipated challenges this quarter, but we still delivered growth. Markets in Brazil and Argentina were more challenging than expected due to the delayed rains and increased borrowing rates. The bankruptcy of a large customer in Brazil added specific challenges for FMC. Given that we believe we are only a couple of quarters away from a more normal market situation, we decided to take pricing actions to maintain our market position*. In fact, about two-thirds of the total company price decline in the quarter came from Brazil and Argentina. The rest of the region performed at or above expectations. While conditions are improving, it's clear that Latin America has not yet emerged from the down cycle as distributors and growers continue to manage their inventories carefully.

*      *      *

Looking ahead, *our view on the timeline of channel inventory recovery is relatively unchanged from what we communicated during our August earnings call*. The U.S. and most countries in Europe are normalizing the fastest and Latin America is expected to be much improved in the second quarter of 2025. Asia markets are still expected to be very challenging in 2025 with no recovery expected until 2026 as India continues to work through excess channel inventory.

*On a cost basis, we are accelerating the delivery of savings and increasing our targets*. We are now targeting cost benefits from restructuring of $125 million to $150 million to be reflected in the P&L in 2024, with greater than $225 million of gross run-rate in 2025. To accomplish this, we are accelerating restructuring, taking new critical initiatives to realign our manufacturing footprint, and using attrition as a key tool to drive further savings.

87.    On December 4, 2024, the Company participated in the Goldman Sachs Industrials and Materials Conference. During the question-and-answer portion of the conference, defendant Brondeau responded to a question asking about the Company's channel inventory, as stated in the following pertinent exchange:

Q: Unidentified speaker: When you look at kind of the high watermark for that inventory and where you think you're at today with your

products through the chain, how would you categorize the delta? Are you where you want to be all the way through the chain, or do you think there's still some more inventory to come out?

A: defendant Brondeau: I think it's very region dependent. ***We are pretty comfortable with North America and Europe. Things are happening well in Latin America and Brazil, Argentina, where we see product going through the channel with the season, which is turning out despite the delay in rain, pretty good. So we believe Latin America will get by a normalized channel toward the second quarter***.

88.    The above statements were false and/or materially misleading when made because they failed to disclose the following adverse facts: (i) FMC's Project Focus was not succeeding in its goal of meaningfully lowering FMC inventory in the distribution channel; (ii) FMC's channel inventories were not rebalancing or normalizing, and in fact, were getting worse as a result of Defendants' own undisclosed sales practices; (iii) FMC had inflated short-term revenues by engaging in manipulative sales practices; (iv) Project Focus was lagging in its goal of accelerating manufacturing cost reductions; (v) FMC's pricing arrangements with key distributors would significantly lower FMC's revenues and profits in the near-term; (vi) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (vii) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

## VII.  <u>THE TRUTH EMERGES</u>

89.     On February 4, 2025, FMC issued a press release titled "FMC Corporation announces 2024 fourth quarter and full year results, provides 2025 outlook," announcing its financial results for the fourth quarter 2024 (the "Q4 2024 Press Release"). In the Q4 2024 Press Release, FMC revealed that it had missed its previously announced full fiscal year revenue guidance as well as consensus revenue estimates by $90 million. Defendant Brondeau was quoted in the Q4 2024 Press Release, stating, "[w]hile we saw a good increase in volume, *the growth was below our expectations as we learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically*." In particular, sales in Latin America—FMC's most significant region—were down 10%. The Company also provided a Full Year 2025 outlook, disclosing that it expected revenue to remain essentially flat due to "*weaker demand in the channel as customers in many countries prioritize holding lower-than-historical levels of inventory*." Specifically, the Q4 2024 Press Release stated, in relevant part:

> **FMC Corporation announces 2024 fourth quarter and full year results, provides 2025 outlook**
>
> Fourth quarter results benefited from 7 percent sales growth and continued cost favorability; Company reported strong year of cash generation with over $1 billion improvement in Cash from Operations
>
> \*     \*     \*
>
> **Full-Year 2024 Highlights**

- Revenue of $4.25 billion lower by 5 percent versus prior year and down 3 percent organically

- Consolidated GAAP net income of $342 million, down 74 percent versus 2023

- Adjusted EBITDA of $903 million, down 8 percent versus 2023

- Consolidated GAAP earnings of $2.72 per diluted share, down 74 percent versus 2023

- Adjusted earnings of $3.48 per diluted share, down 8 percent versus 2023

- Consolidated GAAP cash flow from operations of $737 million, an increase of $1.04 billion versus 2023

- Free cash flow of $614 million, an increase of $1.14 billion versus 2023

\*      \*      \*

"***While we saw a good increase in volume, the growth was below our expectations as we learned during the quarter that customers in many countries sought to hold significantly less inventory than they have historically***. This dynamic, along with more pronounced FX impacts, acted as a headwind to further growth. Over seventy-five percent of our sales growth came from our growth portfolio. This, together with continued cost discipline, was a key factor in delivering a strong year-over-year increase in adjusted EBITDA, which was above our guidance midpoint."

90.    That same day, on February 4, 2025, FMC hosted an earnings call for

the fourth quarter of 2024 (the "Q4 2024 Earnings Call") with investors and analysts.

During the Q4 2024 Earnings Call, defendant Brondeau stated:

***I have modified my view of what needs to be done for FMC*** to fully benefit from the market upturn when it happens, and the quality of our portfolio. ***The company needs a stronger reset than what I thought***

*initially*. We learned a lot in the fourth quarter, and it has become clear that **we need to take more aggressive actions to reposition FMC. Above all, we need to significantly lower FMC inventory in the channel, much beyond what we were expecting**. We also need to give a higher priority to the implementation of our newly developed strategy for Rynaxypyr® and Cyazypyr®, including accelerating the implementation of our manufacturing cost reduction efforts.

**These actions will have a pronounced negative impact on 2025 financial performance beyond what we anticipated**.

\*    \*    \*

[W]e saw lower-than-expected demand across most regions as customers lowered the amount of inventory they were willing to hold versus historical levels. While we did anticipate customers would hold less inventory in an environment of higher interest rates, lower commodity prices and a perception of secure supply, we were not expecting behavior to change to such a degree.

Given the above assumptions, and the current high levels of FMC product in the channel, **we now believe we have elevated channel inventories in some countries in LATAM, including Brazil; Asia, including India; as well as Canada and Eastern Europe**.

91.    The press release and statements made by the Individual Defendants here were in contradiction to statements made earlier by them. During those earlier statements, Defendants portrayed a false impression of Project Focus's success and the Company's related efforts to balance its channel inventory, achieve cost savings, and increase productivity to foster sustainable growth.

92.    The market reacted immediately and negatively to the Company's revelation. On this news, FMC's share price declined more than 33%, from a closing

price of $54.04 on February 4, 2025, to a closing price of $35.92 per share on February 5, 2025.

93.    The damages FMC has suffered are a direct and proximate result of the Individual Defendants' breaches of fiduciary duties. Thus, as a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## VIII. THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

94.    In breach of their fiduciary duties to FMC, and in violation of federal securities laws, defendants issued, and caused the Company to issue, the above misleading statements. These statements artificially inflated the price of FMC's stock.

95.    When an employee's restricted stock units vest, the employee owes taxes on those stock units. Further, when an employee exercises a stock option, there are costs associated with the exercise of the option, such as paying the exercise price. Instead of incurring these costs, FMC allows employees to relinquish their stock. The amount of stock that the employee relinquishes is based on FMC's stock price. The greater the stock price, the less stock the employee has to relinquish. In the case of relinquishing the stock for tax purposes, FMC has to then pay the actual taxes owed to the respective taxing authorities. FMC pays that amount in cash, not stock. The amount FMC pays is based on the value at the time of the relinquishment of the stock, therefore, even if its stock price goes down, FMC is on the hook for the cash

payment to the government. As a result, FMC is damaged in two ways when its stock price is inflated and an employee relinquishes stock to it. First, the Company receives less stock than it should. Second, the Company pays more taxes than it should and does not receive stock worth that corresponding amount.

96.     The expense to the Company from this program is substantial. The Company accounts for the relinquishment of the stock as an expense in its financial statements, categorizing it as a repurchase of stock.

97.     In particular, the Company repurchased the following amount of stock during the Relevant Period:

| Date Range of Buyback | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| November 1 - 30, 2023 | 882 | $53.43 | $47,125.26 |
| December 1 - 31, 2023 | 726 | $55.88 | $40,568.88 |
| January 1 - 31, 2024 | 1,482 | $57.95 | $85,881.90 |
| February 1 - 29, 2024 | 31,033 | $52.44 | $1,627,370.52 |
| March 1 - 31, 2024 | 7,306 | $59.63 | $435,656.78 |
| April 1 - 30, 2024 | 930 | $57.84 | $53,791.20 |
| May 1 - 31, 2024 | 1,977 | $64.42 | $127,358.34 |
| June 1 - 30, 2024 | 791 | $56.28 | $44,517.48 |
| July 1 - 31, 2024 | 2,181 | $58.07 | $126,650.67 |
| August 1 - 31, 2024 | 2,024 | $61.46 | $124,395.04 |
| September 1 - 30, 2024 | 5,288 | $65.87 | $348,320.56 |
| October 1 - 31, 2024 | 635 | $62.33 | $39,579.55 |
| November 1 - 30, 2024 | 1,401 | $56.65 | $79,366.65 |
| December 1 - 31, 2024 | 935 | $49.96 | $46,712.60 |
| January 1 - 31, 2025 | 3,293 | $55.26 | $181,971.18 |
| February 1 - 31, 2025 | 36,847 | $38.10 | $1,403,870.70 |
| March 1 - 31, 2025 | 6,328 | $36.73 | $232,427.44 |
| April 1 - 31, 2025 | 3,909 | $39.77 | $155,460.93 |

| May 1 - 31, 2025 | 35 | $42.15 | $1,475.25 |
| June 1 - 31, 2025 | 53 | $42.73 | $2,264.69 |
| **Total** | **108,056** | | **$5,204,765.62** |

98.    During the Relevant Period, FMC repurchased its own shares at artificially inflated prices, causing substantial damage to the Company. In total, the Company paid over $5.2 million repurchasing approximately 108,056 shares of its own common stock at prices that did not reflect the actual value of the stock.

99.    As a result, the Company overpaid by approximately $5.2 million for repurchases of its own common stock during the Relevant Period.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

100.    Plaintiff brings this action derivatively in the right and for the benefit of FMC to redress injuries suffered, and to be suffered, by FMC as a direct result of breaches of fiduciary duties, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof, and violations of the federal securities laws by the Individual Defendants. FMC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101.    Plaintiff will adequately and fairly represent the interests of FMC and its shareholders in enforcing and prosecuting her rights and has retained counsel competent and experienced in derivative litigation.

102.   Plaintiff has been a shareholder of FMC since at least 2022, has continuously been a shareholder since that time, and is a current FMC shareholder.

103.   A pre-suit demand on the Board is futile and therefore excused. At the time this action commenced, the Board consisted of the following thirteen directors: Defendants Brondeau, Cordeiro, Davidson, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin (the "Demand Board"), as well as Non-Parties DiSilvestro, Merkt, and Raines. All thirteen members of the Board are incapable of exercising independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

104.   All members of the Demand Board face a substantial likelihood of liability for their individual misconduct. The Demand Board were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that FMC's SEC filings, press releases, and other public statements and presentations on behalf of FMC concerning its business, operations, prospects, internal controls, and financial statements were accurate.

105.   The Demand Board breached their fiduciary duties of care, loyalty, good faith, and candor by allowing Defendants to cause, or by themselves causing, FMC to make improper public statements and omissions concerning: (i) Project Focus's efforts in lowering FMC's inventory in the distribution channel; (ii) the rebalancing or normalization of FMC's channel inventories; (iii) Project Focus's

efforts to accelerate manufacturing cost reductions; (iv) FMC's cost-plus pricing arrangements with distributors; and (v) FMC's risk disclosures.

106.   The conduct of the Demand Board complained of herein involves a knowing and culpable violation of their obligations as officers and directors of FMC, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Demand Board were aware, or reckless in not being aware, posed a risk of serious injury to the Company. The Demand Board knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that FMC's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.

107.   As alleged above, the Demand Board has breached their fiduciary duties to FMC and its stockholders and have violated state and federal laws. As a result of their misconduct, the Company now possesses valuable claims against the Individual Defendants for breaching their fiduciary duties of care and loyalty (and the duty of disclosure derived therefrom). Finally, the Company has claims against the Demand Board for their unjust enrichment by the compensation and director remuneration at the expense of and to the detriment of FMC.

108.   The Demand Board will not bring a suit on behalf of FMC to recover damages sustained as a result of this misconduct because doing so would expose themselves to significant liability. As such, demand is futile as to the Demand Board.

109.   Demand upon defendant Brondeau is futile for the following reasons. Defendant Brondeau has served as the Company's CEO since June 2024 and as Chairman of the Board since 2010. FMC has admitted in its SEC filings that defendant Brondeau is not an independent director for purposes of demand futility. Additionally, defendant Brondeau's roles within FMC are his principal occupation, for which he receives significant compensation. As a Company director, defendant Brondeau conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Brondeau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

110.   Demand upon defendant Cordeiro is futile for the following reasons. Defendant Cordeiro has served as a Company director since 2011 for which he receives significant compensation from the Company. As a Company director, defendant Cordeiro conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Cordeiro breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

111.   Demand upon defendant Davidson is futile for the following reasons. Defendant Davidson has served as a Company director since 2020 for which he receives significant compensation from the Company. As a Company director, defendant Davidson conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

112.   Demand upon defendant Fortmann is futile for the following reasons. Defendant Fortmann has served as a Company director since 2022 for which she receives significant compensation from the Company. As a Company director, defendant Fortmann conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect FMC's corporate assets. As such, defendant Fortmann breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

113.   Demand upon defendant Greer is futile for the following reasons. Defendant Greer has served as a Company director since 2002 for which he receives

significant compensation from the Company. As a Company director, defendant Greer conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

114. Demand upon defendant Johnson is futile for the following reasons. Defendant Johnson has served as a Company director since 2013 for which she receives significant compensation from the Company. As a Company director, defendant Johnson conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect FMC's corporate assets. As such, defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

115. Demand upon defendant Kempthorne is futile for the following reasons. Defendant Kempthorne has served as a Company director since 2009 for which he receives significant compensation from the Company. As a Company director, defendant Kempthorne conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Kempthorne breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

116.   Demand upon defendant Øvrum is futile for the following reasons. Defendant Øvrum has served as a Company director since 2016 for which she receives significant compensation from the Company. As a Company director, defendant Øvrum conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded her duties to protect FMC's corporate assets. As such, defendant Øvrum breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon her is futile and excused.

117.   Demand upon defendant Pallash is futile for the following reasons. Defendant Pallash has served as a Company director since 2008 for which he receives significant compensation from the Company. As a Company director, defendant Pallash conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Pallash breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

118.   Demand upon defendant Verduin is futile for the following reasons. Defendant Verduin has served as a Company director since 2023 for which he

receives significant compensation from the Company. As a Company director, defendant Verduin conducted little, if any, oversight of the Company's issuance of false and misleading statements and consciously disregarded his duties to protect FMC's corporate assets. As such, defendant Verduin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, therefore, demand upon him is futile and excused.

119.    Demand upon DiSilvestro is futile for the following reasons. DiSilvestro has served as a Company director since December 2024 for which he receives significant compensation from the Company. As such, DiSilvestro cannot independently or impartially consider any demand adverse to the Demand Board serving on the Compensation and Human Capital Committee who determine DiSilvestro's compensation. DiSilvestro therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon DiSilvestro is thus futile and excused.

120.    Demand upon Merkt is futile for the following reasons. Merkt has served as a Company director since April 2025 for which he receives significant compensation from the Company. As such, Merkt cannot independently or impartially consider any demand adverse to the Demand Board serving on the Compensation and Human Capital Committee who determine Merkt's compensation. Merkt therefore could not objectively and disinterestedly consider a

demand to sue the Individual Defendants and any demand upon Merkt is thus futile and excused.

121.  Demand upon Raines is futile for the following reasons. Raines has served as a Company director since 2024 for which he receives significant compensation from the Company. As such, Raines cannot independently or impartially consider any demand adverse to the Demand Board serving on the Audit Committee. Raines therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Raines is thus futile and excused.

**Additional Reasons Demand Is Futile**

122.  Defendants Cordeiro, Davidson, and Pallash – the Audit Committee Defendants – served as members of the Audit Committee during the Relevant Period. As described in detail above, the Audit Committee is required to oversee the accounting and financial reporting processes of FMC and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter. In violation of the charter, the Audit Committee Defendants failed to adequately exercise their risk management and risk assessment obligations; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of

Conduct. Thus, defendants Cordeiro, Davidson, and Pallash further breached their fiduciary duties, are not disinterested, thus, demand is futile and excused as to them.

123.   FMC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Demand Board has not caused FMC to take action to recover the damages FMC has suffered and will continue to suffer thereby.

124.   In violation of the Code of Conduct, the Demand Board conducted little, if any, oversight of the Company's involvement in the Individual Defendants' scheme to cause FMC to issue materially false and misleading statements to the public and to facilitate the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Demand Board failed to comply with relevant laws and regulations, failed to maintain accurate company records, public reports, and communications, and failed to uphold their responsibilities related thereto. Therefore, the Demand Board faces a substantial likelihood of liability, thus, demand futile and excused as to them.

125.   The Demand Board received, and continues to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board of FMC. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the

prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

126.   The Demand Boards' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the members on the Demand Board can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). Because a majority of the Demand Board faces a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of FMC. Accordingly, demand is excused as being futile.

127.   Publicly traded companies, such as FMC, typically carry director and officer liability insurance from which FMC could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover FMC's damages. If no such insurance is carried, then the Demand Board will not cause FMC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

128.    Accordingly, each of the members on the Demand Board, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. As such, any demand upon the Demand Board is excused as being futile.

129.    Accordingly, Plaintiff properly brings this derivative action.

## X.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

130.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

131.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did deceive the investing public, including shareholders of FMC, regarding the Individual Defendants' management of FMC's operations, by and through the Individual Defendants' executive and directorial positions at FMC and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

132. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper statements.

133. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and business prospects.

134. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Director Defendants were a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

135. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## XI.   **DAMAGES TO FMC**

136.   The Individual Defendants' improper conduct in breach of their fiduciary duties and as described in detail herein, wasted FMC's assets, caused the Company to needlessly incur substantial economic and reputational harm, and caused the Company a significant loss in market capitalization, compromised financial integrity, and irreparable harm to its credibility.

137.   Defendants' conduct damaged FMC's reputation within the business community and in the capital markets. In addition to price, FMC's current and potential customers generally consider a Company's ability to accurately value its business prospects to be important. Businesses and customers are less likely to engage with companies that are uncertain about their own financial condition. FMC's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections the Individual Defendants permitted to be disseminated have materially increased the perceived risks of investing in and lending money to FMC.

138.   Moreover, as a direct and proximate result of the Individual Defendants' wrongful actions, FMC is now the subject of damaging and costly litigation, including the federal Related Securities Action.

139.   Finally, the Individual Defendants wrongful conduct has and will continue to cause FMC to waste resources from costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to FMC.

## COUNT I

### Against the Individual Defendants for Violation of Section 14(a) of the Exchange Act

140.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

142.   Defendants Brondeau, Cordeiro, Davidson, Douglas, Fortmann, Greer, Johnson, Kempthorne, Øvrum, Pallash, and Verduin negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2024 Proxy Statement. In the 2024 Proxy Statement, the Board solicited stockholder votes to approve: (i) the election of eleven directors, each for a term of one year; (ii) the ratification of the

appointment of KPMG LLP as the Company's independent registered public accounting firm for 2024; (iii) an advisory (non-binding) vote on executive compensation; and (iv) votes on a stockholder proposal requesting simple majority vote.

143.   The 2024 Proxy Statement, however, misrepresented and failed to disclose that: (1) Project Focus was not succeeding in its goal of significantly lowering FMC inventory in the distribution channel; (2) FMC's channel inventories were not rebalancing or normalizing, but instead were getting worse; (3) Project Focus was failing to accelerate manufacturing cost reductions; (4) the Company's cost-plus pricing arrangements with key distributors would drastically lower FMC's revenues and profits near-term; (5) FMC's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and (6) as a result of the above, the Individual Defendants' positive statements regarding the Company's business, operations, and prospects were materially false and/or misleading and lacked a reasonable basis at all relevant times.

144.   The 2024 Proxy Statement was also materially misleading because the Board did not disclose that the Company failed to maintain adequate disclosure controls and procedures with respect to FMC's operations. Additionally, the Board failed to implement a reasonable, meaningful, and well-constituted system of

internal controls to ensure that struggles with excessive inventory in the distribution channel and demand were timely brought to the Board's attention. Further, the 2024 Proxy Statement was materially misleading because it did not disclose that FMC faced significant reputational harm when the truth would inevitably unfold.

145.   By reason of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, FMC misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding FMC's recommendation to reelect certain Board members, vote on executive compensation, and approve the stockholder proposal requesting simple majority vote.

146.   The misleading information contained in the 2024 Proxy Statement was material to FMC's stockholders in determining whether or not to elect these defendants, vote on executive compensation, and approve the stockholder proposal. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the 2024 Proxy Statement was an essential link in the reelection of nominees to the Board and the decision to adopt the proposal requesting simple majority vote.

147.   Plaintiff, on behalf of FMC, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2024 Proxy Statement in connection

with the improper reelection of the members of the Board and vote for the shareholder proposal.

## COUNT II

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act

148.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.  The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

150.  The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading.

151.  The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about FMC not misleading.

152.  The Individual Defendants, top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by FMC.

153.  The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations/omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases and filings with the SEC.

154.  The Individual Defendants, by virtue of their receipt of information reflecting the true facts of FMC, their control over, and/or receipt and/or modification of FMC's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FMC, participated in the fraudulent scheme alleged herein.

155.  As a result of the foregoing, the market price of FMC common stock was artificially inflated during the Relevant Period. Plaintiff and other shareholders relied on the statements described above and/or the integrity of the market price of

FMC common stock in purchasing FMC common stock at prices that were artificially inflated and was damaged thereby.

156.  By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

157.  Plaintiff, on behalf of FMC, has no adequate remedy at law.

## **COUNT III**

**Against Defendants Douglas, Sandifer, and Brondeau for Contribution Under Sections 10(b) and 21D of the Exchange Act**

158.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.  The conduct of defendants Douglas, Sandifer, and Brondeau as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

160.  FMC, Douglas, Sandifer, and Brondeau are named as defendants in the Related Securities Action that alleges and asserts claims arising under the federal securities laws. FMC is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

161.  If FMC is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of defendants Douglas, Sandifer, and Brondeau as alleged herein, who have caused the Company to suffer substantial harm through their

misconduct. FMC is entitled to contribution and indemnification from defendants Douglas, Sandifer, and Brondeau in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

162. As officers and/or directors, defendants Douglas, Sandifer, and Brondeau had the power or ability to, and did, control or influence, either directly or indirectly, FMC's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

163. Defendants Douglas, Sandifer, and Brondeau are liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

164. Defendants Douglas, Sandifer, and Brondeau have damaged the Company and are liable to the Company for contribution. As such, FMC is entitled to receive all appropriate contribution or indemnification from defendants Douglas, Sandifer, and Brondeau.

## <u>COUNT IV</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

165. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.   The Individual Defendants owed and owe FMC fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe FMC the highest obligation of care, loyalty, and good faith. Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, could have prevented the misconduct and consequential harm to FMC alleged herein.

167.   The Individual Defendants and each of them, violated and breached their fiduciary duties of care, loyalty and good faith by causing or allowing the Company to disseminate materially misleading and inaccurate information to FMC shareholders. These actions were not a good faith exercise of prudent business judgment.

168.   At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by defendants, defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to defendants' false or misleading statements. Defendants engaged in a scheme to defraud FMC by causing the Company to purchase over $5.2 million in shares of FMC stock at artificially inflated prices.

169.   The Director Defendants either knew or were reckless, in disregarding the illegal activity of such substantial magnitude and duration. By their actions and

by engaging in the wrongdoing described herein, the Director Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of FMC in a manner consistent with their fiduciary duties. The Director Defendants breached their fiduciary duties by recklessly issuing or recklessly permitting the Company to issue improper statements.

170.  The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

171.  Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by the Company itself.

172.  By committing and permitting the misconduct alleged herein, the Individual Defendants breached their fiduciary duties in the management and administration of FMC's affairs and in the use and preservation of FMC's assets.

173.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, FMC has sustained significant damages, as alleged herein.

As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

174.   Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Waste of Corporate Assets**

175.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.   As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources repurchasing its own shares at artificially inflated prices, as well as by forcing the Company to pay the improper, unnecessary and unjustified compensation and awards and benefits to the Individual Defendants.

177.   Additionally, as a result of the Individual Defendants' misstatements and failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, FMC is subject to a Related Securities Action, related shareholder derivative lawsuits, and scrutiny. The Individual Defendants have caused FMC to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the various matters, in addition to any ensuing costs from a potential settlement or adverse judgment.

178.   As a result of the waste of corporate assets, FMC has sustained significant harm. Accordingly, the Individual Defendants are liable to the Company.

179.   Plaintiff, on behalf of FMC, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Unjust Enrichment

180.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.   By their wrongful acts and omissions and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of FMC. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to FMC.

182.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

183.   Plaintiff, as a shareholder and representative of FMC, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court

disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

184.   Plaintiff, on behalf of FMC, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of FMC, demands judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of the federal securities laws;

B.    Directing FMC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FMC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen Board oversight and supervision over FMC's proxy costs;

2.    a proposal to strengthen the Company's controls over financial reporting;

- 78 -

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.    a provision to permit the shareholders of FMC to nominate at least three candidates for election to the Board; and

5.    a proposal to strengthen FMC's oversight of its disclosure procedures;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of FMC, has an effective remedy;

D.    Awarding to FMC restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: November 26, 2025                    **THE ROSEN LAW FIRM, P.A**.

*/s/ Olivia D. Simkins*
OLIVIA D. SIMKINS (PA ID: 336339)
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
osimkins@rosenlegal.com

**JOHNSON FISTEL, PLLP**

MICHAEL I. FISTEL, JR.
MARY ELLEN CONNER
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile:(619) 363-8326
MichaelF@johnsonfistel.com
MaryEllenC@johnsonfistel.com

*Attorneys for Plaintiff Johanna Dwyer*

## **VERIFICATION**

I, Johanna Dwyer, am a plaintiff in the within action. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, know the content thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed this 24th day of November, 2025.

DocuSigned by:

*Johanna Dwyer*

710BB71CFAAA44E

JOHANNA DWYER